REVISED December 30, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2009

Charles R. Fulbruge III
Clerk

No. 07-40904
consolidated w/08-40300

EAST TEXAS MEDICAL CENTER REGIONAL HEALTHCARE SYSTEM

Plaintiff-Appellant

V.

LEXINGTON INSURANCE CO

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

Leslie H. Southwick, Circuit Judge:

East Texas Medical Center sued its insurer, Lexington Insurance Company, for failure to cover a claim filed against it by a patient. A jury found for the Medical Center. The district court then granted Lexington a judgment as a matter of law. The Medical Center appeals. For reasons we will explain, we VACATE and REMAND for additional proceedings.

## I. FACTS

This case concerns Lexington's denial of the Medical Center's claim for coverage under a "claims-made" liability insurance policy it purchased from

Lexington. The dispute centers on the notice and reporting requirements of the policy. The specific issue is whether the Medical Center properly gave notice of the claim and of a subsequent lawsuit to Lexington.

A. The Policy

Lexington issued a one-year, $5 million claims-made medical malpractice liability policy to the Medical Center. The policy period was from June 8, 2002, to June 8, 2003. The policy provided excess liability insurance coverage to the Medical Center, covering claims above a self-insured retention of $2 million per claim. The Medical Center also purchased excess coverage policies from other insurers to cover claims exceeding the policy's $5 million coverage layer.

Under the Medical Center's arrangement with its insurers, the Medical Center was the first link in its risk management chain. The Medical Center had responsibility for processing claims and monitoring all incidents potentially giving rise to medical malpractice claims ("medical incidents"). The Medical Center had discretion to resolve any claim within its $2 million retention. If a lawsuit was filed on any claim, the Medical Center could retain counsel of its own choosing for its defense. When Lexington was notified of a claim by the Medical Center, Lexington had discretion to decide which claims it would investigate or otherwise pursue.

The pertinent parts of the policy in dispute relate to the Medical Center's notice responsibilities. If the Medical Center wanted coverage, it was required to provide "written notice" to Lexington of three different matters: medical incidents, claims, and lawsuits. The issues at trial concerned notice of claim and notice of lawsuit. No questions have been raised about notice of a medical incident.

In addition to being required to give notice of claims and lawsuits, the Medical Center also had to provide relevant documents. It was to send

"immediately" to Lexington copies of any demands, notices, summonses, or legal papers received in connection with a claim or lawsuit.

B. The Underlying Claim

In March 2003, the Medical Center received a medical malpractice claim that was in the form of what is called a 4590i letter.[1] The claim was on behalf of David Wayne Cornelius. This is the claim that has generated the present lawsuit. The letter indicated that Cornelius had suffered unspecified personal injuries at the Medical Center's Athens, Texas facility. In April 2003, the Medical Center entered information about the Cornelius claim on a computer-generated spreadsheet, which is referred to as a "loss run." Each loss run document that is in the record contains entries for about 40 claimants.

A key dispute at trial was whether Lexington accepted loss runs as claim notice. There was evidence that Lexington acknowledged receipt of three other claims submitted on loss runs. Lexington did not acknowledge receipt of the Cornelius claim when it appeared on a loss run. The Cornelius claim was included on three different loss runs provided to Lexington before the policy period ended, each of which noted that there was a 4590i letter.[2] At the end of the policy period, the loss run remained the only notice given Lexington.

C. The Underlying Lawsuit

On May 27, 2003, Cornelius's mother filed a medical malpractice lawsuit on his behalf in state court against the Medical Center. The Medical Center

---

[1] A "4590i letter" notifies a healthcare provider that an injured party is asserting a healthcare liability claim against the provider. See Tex. Civ. Prac. & Rem. Code Ann. § 74.051. A 4590i letter must be submitted to the healthcare provider at least 60 days before the filing of a suit based on a healthcare liability claim. Id. The term "4590i letter" dates from an earlier numerical codification of this requirement in the statutes. Id. § 74.001 et seq.

[2] Loss runs sent by the Medical Center to Lexington typically included: the identification of the type of claim, the initial reserve, and the status of each claim.

assigned defense of the case to an attorney. The suit was timely answered on behalf of the Medical Center.  Less than two weeks later, on June 8, 2003, the policy period expired.  At the time, the Medical Center did not consider the Cornelius lawsuit to be one with a high risk of exposure, nor did it believe that its liability for the claim would exceed its self-insured retention or impact the Lexington policy coverage layer and those of other excess insurers.

D. Notice of Claim and Lawsuit

Following depositions in the Cornelius lawsuit in December 2003, the Medical Center realized for the first time that its liability for the lawsuit was likely to exceed the Medical Center's $2 million self-insured retention.

In January 2004, very soon after the depositions but about seven months after both the lawsuit was filed and the policy period expired, the Medical Center first gave written notice of the Cornelius lawsuit to Lexington.  It also sent copies of the claim and suit papers.  Later that month, Lexington denied the claim, asserting that the Medical Center had failed to comply with the Lexington policy's notice provisions.

E. Procedural History

The Medical Center brought this lawsuit against Lexington and other insurers[3], alleging causes of action arising from Lexington's denial of its claim in connection with the Cornelius lawsuit.  The Medical Center's claims against Lexington included breach of contract, violation of the Texas Insurance Code, and negligent misrepresentation.  Lexington counter-claimed, alleging breach of contract, asking for a declaration of noncoverage under the Lexington policy, and seeking reimbursement for settlement of the underlying Cornelius lawsuit.  Before this coverage suit was tried, the Cornelius lawsuit was settled.

---

[3] The other excess insurers are either no longer parties or the proceedings relating to them have been stayed pending arbitration.

4

The parties proceeded to trial. Before the case went to the jury, Lexington abandoned its request for a declaratory judgment. The jury returned a verdict in favor of the Medical Center on all claims. Awarded were approximately $1.7 million in damages. Lexington moved for a judgment as a matter of law. It asserted that there was insufficient evidence to support the jury findings on any of the claims. The district court granted the motion, rendering judgment in favor of Lexington and against the Medical Center on all claims.

## II. DISCUSSION

This court gives de novo review to a district court's ruling on a motion for a judgment as a matter of law ("JMOL"). Poliner v. Tex. Health Sys., 537 F.3d 368, 375-76 (5th Cir. 2008). Such a judgment is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). When considering a Rule 50 motion, "'the court must review all of the evidence from the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence.'" Poliner, 537 F.3d at 376 (quoting Ellis v. Weasler Eng'g, Inc., 258 F.3d 326, 337 (5th Cir. 2001)). A court is to consider all the evidence presented at trial in the light most favorable to the nonmoving party. It should disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).

The Medical Center claims several defects in the grant of a JMOL. First, though, we must address an argument that would moot all the Medical Center's issues. This leads to a total of five issues to be decided in this appeal. To start, we consider Lexington's argument that (1) loss runs are not a sufficient notice of claim under the policy. We end up not accepting that argument.

5

We therefore address four other arguments: (2) the policy does not require that Lexington receive separate notice of a "suit," if notice of a "claim" on the same incident had previously been given; (3) Texas law requires Lexington to demonstrate prejudice from any failure to provide notice of the suit, and further, Lexington waived the claim of a failure to give notice; (4) the jury erred in finding that Lexington waived its right to enforcement of another policy provision requiring the immediate forwarding of claim and suit papers; and (5) the district court improperly denied the Medical Center's statute-based claims.

(1) Loss Runs as Notices of Claims

Lexington argues that loss runs are, by their nature, insufficient to satisfy the policy's requirement for a written notice of claim. Therefore, as a legal matter, Lexington had no notice of the underlying claim until seven months after the policy expired.

The point was contested and made into an issue for the jury. The jury was asked whether the Medical Center failed "to provide Lexington . . . with written notice of the David Cornelius claim as soon as possible." The jury's answer was "no." The district court upheld this portion of the verdict.

The loss runs offered in evidence were computer-generated spreadsheets containing relatively scant information about multiple patients' claims. As an excess insurer, Lexington concerned itself with the total on the loss runs, in order to gauge, to a rough degree, how close the Medical Center was to its $2 million self-insurance limit. The loss run estimated the value of the Cornelius claim at only $25,000. After the suit was filed, the Medical Center estimated its value to be "in excess of $10,000,000." It would be unreasonable, it says, to interpret "written notice" of a claim to include a document so lacking in the relevant particulars as the loss run. Those points are relevant, but they are not conclusive to the result.

The Medical Center relies on letters sent by Lexington to the Medical Center regarding three unrelated claims that had been reported through loss runs. The first line of each letter from Lexington states that the letter is an "acknowledgment of receipt of the notice of claim on the above captioned patient." Lexington suggests a distinction between acknowledging coverage and acknowledging receipt of information. According to Lexington, the letters it sent did only the latter. No doubt there are distinctions between the two, but we are examining the policy provision requiring "written notice of the claim or suit." Lexington sent letters, in response to loss runs, acknowledging "receipt of the notice of claim." A jury did not need to find that loss runs were accepted by Lexington as written notices of claims, but these letters are evidence of that.

To be clear, we are not saying that Lexington waived a provision of the policy and accepted less notice than that to which it was entitled. There is no language in the policy that limits "written notice" to a particular format. Lexington presented testimony of various insurance company employees and experts about the inappropriateness of loss runs as claim notices. Its conclusion was that "even if the loss run somehow contained all of the necessary information, it would still not qualify as an individual and official report of a claim." That too was evidence for jurors to consider, giving it such weight as they thought proper.

In Texas, as elsewhere, ambiguities in insurance contracts must be interpreted to favor the insured. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc., 811 S.W.2d 552, 555 (Tex. 1991). We do not find that the bare requirement for a "written notice of any claim" has sufficiently clear meaning so as to avoid the just-stated interpretive principle. No level of detail is specifically required. Of some relevance, perhaps, is that a separate, subsequent policy provision that we will discuss requires immediate forwarding

of all papers related to the claim. That requirement suggests that the notice of the claim was not designed to bear the entire informational burden. Lexington's letters accepting loss runs as notice of claims in the other cases supports that the jury's finding was reasonable. A jury issue existed, and a valid answer was given, that loss runs could provide the notice of claims.

(2) Separate Notice of Claim and Suit

The district court interpreted the policy's language as requiring separate notice of both a claim and a suit arising from the same incident in order to preserve coverage. Subsection V.C.2.b. of the policy states that the Medical Center was to send Lexington written notice of claim or a suit "as soon as practicable." This is important because, at most, the loss runs gave notice of the claim. There was no notice of the suit until seven months after the policy expired. That expiration was within a few weeks of when the suit was filed.

The district court found the policy provision established three duties – "recording [the specifics of the claim or suit], giving written notice of the claim or suit, and sending claims or suit papers." Each of these duties was set forth in its own subsection, with the word "and" linking each. We agree with the district court that the three subsections, linked as they are, set forth requirements that must each be met by the insured. What still needs to be resolved are the form of the notice and the effect of any delay.

The Medical Center argues that the disjunctive construction of the phrase "notice of the claim or suit" indicates that only one or the other is required for a given medical incident. It also points to the definitions of "claim" and "suit" given earlier in the policy. A "claim" is defined to include a "suit," while a "suit" is "a civil action" for damages arising from, among other things, "a claim." These

definitions suggest, it argues, that notice of claim "by definition includes any subsequently filed suit on that claim." Accordingly, no additional notice of the Cornelius lawsuit was required.

The Medical Center's interpretation of the use of the word "or" is unreasonable. If the insured had an option of which of the two events to report for any given medical incident, it would mean, as here, that the Medical Center was not required to report a suit subsequent to a claim so long as it had reported the claim. But it would also mean that an insured would have no duty to report a claim, so long as it planned to report the eventual filing of a suit, perhaps months later (there apparently would be no duty ever to report anything were a suit not actually filed). It is not clear how this view would interact, under the Medical Center's theory, with the vital importance of reporting claims under a claims-made policy, a topic discussed in the next section. We find the policy required separate notice of claim and of suit.

The Medical Center's reliance on the policy definitions is equally unavailing. The fact that a "claim" is defined to include a "suit" does not mean that all claims are thereby converted into suits, such that only one notice is required. If the first notice of claim a hospital received was the claim in a lawsuit, then it would make sense for the hospital to provide only one notice to its insurer, both as a matter of the policy definitions and of common sense.

But this does not work in reverse, because all claims are not suits, as the facts of this case demonstrate. The initial claim made to the Medical Center came not in the form of a lawsuit, but rather in the form of the 4590i letter regarding Cornelius's injuries. It is not consistent with logic or the ordinary use of language to regard the suit filed in late May 2003 as somehow already having been reported to Lexington by notice of a simple claim filed two months earlier. The making of a claim in March 2003 gave rise to a duty to notify Lexington

about it. The filing of the lawsuit in May gave rise to a new duty to report the suit. Texas law is not to the contrary. See Members Mut. Ins. Co. v. Cutaia, 476 S.W.2d 278, 279-80 (Tex. 1972). We cite Cutaia not for its discussion of prejudice, which has been superceded by subsequent developments in Texas insurance law. Rather, the case illustrates that requiring notice of the filing of suit even when an insurer has actual notice of the underlying incident is by no means an unprecedented or inexplicable requirement in an insurance contract.

Because notice of the suit was required, it is important that the district court found notification of the suit seven months after it was filed was not, as a matter of law, notification "as soon as practicable." We agree.

(3) Necessity of Showing Prejudice

We have concluded that the district court was correct to find that the Medical Center violated the policy's requirement to give separate written notice of the filing of the Cornelius lawsuit as soon as practicable. We now turn to whether Lexington should have been required to show it was prejudiced by the lack of prompt notice.

At trial, the Medical Center proposed a jury instruction to require a finding that Lexington was prejudiced by a failure to be notified "as soon as practicable" of a lawsuit or to be sent documents "immediately" received about any suit. The district court refused to submit the instruction. It found that on this issue of prejudice, Texas law distinguishes between two kinds of policies. The contract here was a claims-made policy. The district court found that under Texas law, no showing of prejudice is needed before late notice bars coverage. For occurrence policies, though, prejudice must be shown before inadequacies of notice will bar a claim. Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co., 174 F.3d 653, 658 (5th Cir. 1999) (applying Texas law).

After oral argument on the present appeal, the Supreme Court of Texas decided two cases that guide us. See Prodigy Comm. Corp. v. Agric. Excess & Surplus Ins. Co., No. 06-0598, 2009 WL 795530 (Tex. Mar. 27, 2009); Fin. Indus. Corp. v. XL Specialty Ins. Co., No. 07-1059, 2009 WL 795529 (Tex. Mar. 27, 2009). The parties have filed supplemental briefs addressing these new cases.

Prodigy involved a claims-made policy with a provision requiring notice of claim "as soon as practicable. . . but in no event later than ninety days after the expiration of the Policy." 2009 WL 795530, at *1. The court assumed that even though the notice was given within the ninety-day period, it was not given as soon as practicable. In order to deny coverage, though, the insurer was required to show it was prejudiced by a failure to give notice as soon as practicable. Id. at *3. This was because that provision was not "an essential element of the bargained for exchange" between the parties. Id. at *4.

Prodigy held that a requirement of notice "as soon as practicable" was not essential to the bargain. Such promptness will "'maximiz[e] the insurer's opportunity to investigate, set reserves,'" and plan for possible payment of a claim. Id. at *5 (quoting 13 LEE R. RUSS & THOMAS F. SEGALA, COUCH ON INSURANCE § 186:13 (3d ed. 2005)). By contrast, the requirement that a claim be made within the policy period "'is directed to the temporal boundaries of the policy's basic coverage terms [and] . . . defines the limits of the insurer's obligation.'" Id. (quoting 13 COUCH ON INSURANCE § 186:13). Importantly, the same is true of "a notice provision requiring that a claim be reported to the insurer during the policy period or within a specific number of days thereafter." Id. Such a provision "'define[s] the scope of coverage by providing a certain date after which an insurer knows it is no longer liable under the policy.'" Id. (quoting Resolution Trust Corp. v. Ayo, 31 F.3d 285, 289 (5th Cir. 1994)).

This last point led the Prodigy court to articulate a distinction, though it may not be one directly relevant to this case's outcome. A claims-made policy containing a requirement that claims must be reported to the insurer during a specified period is known as a "claims-made and reported" policy. Id. In such a policy, a provision will require not only that a claim be made but also that it be reported to the insurer within the specified time period. Both reports are "considered essential to coverage" such that "an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice within the policy's specified time frame." Id. Because of our sustaining the jury's finding that loss runs could provide notice of claim, here there was such notice within the policy period. After Prodigy, though, prejudice must be shown to use failure to give notice "as soon as practicable" as a bar to recovery, even under the terms of a claims-made or claims-made and reported policy.

The policy in Prodigy was a claims-made and reported policy, but the insured complied with the 90-day time limitation in that policy. It ran afoul only of the "as soon as practicable" requirement. Thus, the insurer was required to show it had been prejudiced in order to deny coverage. See also PAJ, Inc. v. Hanover Ins. Co., 243 S.W.3d 630, 631 (Tex. 2008) (explaining the "notice-prejudice" principle generally).

In the companion case, XL Specialty, the Supreme Court of Texas applied the same principle to a more traditional claims-made policy. By that, we mean one without a "clear-cut reporting deadline" for the reporting of claims to the insurer, but with an "as soon as practicable" requirement. 2009 WL 795529, at *1-2. The insured had failed to report a claim as soon as practicable, but had done so before the expiration period of the policy. Id. at *2. The court held that, because notice had been received before the end of the policy period, "XL was not

denied the benefit of the claims-made nature of its policy," and could not deny coverage without showing prejudice. Id.

With this new law to guide them, both parties in the present case agree that the policy here is more like the one in XL Specialty than that in Prodigy. The Lexington policy does not establish a particular number of days within which all claims must be reported. Section V.A.1. of the policy provides for a 60-day "Optional Extended Reporting Period" added to the expiration date of the policy if certain conditions are met, but under the facts of this case we need not address the import of this provision.

As we held earlier, the jury was entitled to find that the Medical Center reported the claim to Lexington within the policy period via the loss runs. We also held, though, that the policy required separate notice of "claims" and "suits." It is undisputed that the Cornelius lawsuit, though filed within the policy period, was not reported to Lexington until nearly seven months after the expiration of that period. Thus, it did not meet the "as soon as practicable" requirement.

Before we too quickly apply the Prodigy and XL Specialty approach, we must recognize that nothing in those cases requires the same analysis to be applied to each of two separate notices. Both of those cases dealt with notice of the claim. The Medical Center has overcome that notice hurdle, though it took fact finding by a jury to get them over. Must an insured jump two notice hurdles? We have already concluded that this policy requires separate notices for claims and suits. We have been pointed to no case law indicating that once around the notice track is enough. Yet neither have we been shown case law stating that the notices must keep being given or coverage is lost.

We find no principled basis on which to rule that Prodigy and XL Speciality, once satisfied as to a claim, are no longer relevant for later notices required under the policy. But we do not find that a second notice, the one given

of the filing of a suit, "is directed to the temporal boundaries of the policy's basic coverage terms [and] . . . defines the limits of the insurer's obligation." Prodigy, 2009 WL 795530, at *5 (quotation marks omitted). Notice of suit does not need to be given within the coverage period or any other reporting time. That is because a suit based on a claim that arose during the policy period might not be filed until long after the policy's end. As long as notice of the underlying claim had been timely given, coverage would exist under either a claims-made or claims-made and reported policy. Once a claim has been timely reported, the insurer would be unable to obtain the bargained-for benefit of closing its books until it had ascertained whether a suit would actually be filed. We find, then, that notice of suit is an obligation that is subject to the need to show prejudice.

On remand, an issue will be whether Lexington suffered any actual prejudice as the result of the Medical Center's failure to send notification of the Cornelius lawsuit as soon as practicable.

(4) Waiver by Lexington of Having Suit Papers "Immediately" Sent

Next, in light of our disposition of the preceding issue, we address a question arising from another subsection of the policy. Subsection V.C.2.c. required the Medical Center to send immediately to Lexington "copies of any demands, notices, summonses, or legal papers received in connection with any suit or claim." The district court found as a matter of law that the Medical Center failed to comply with this requirement. The Medical Center does not contest that finding. There was a failure to forward immediately the 4590i letter relevant to the claim, as well as to send the legal papers arising from the suit. The district court then gave to the jury the question whether this failure to forward the papers was nonetheless "excused," or in effect, "waived" under Texas law. The jury answered in the affirmative. In the post-verdict opinion

explaining the grant of JMOL, the district court found that Lexington could and did waive the entitlement of immediate receipt of the suit papers.

The uncontested definition of waiver given the jury was this:

Waiver occurs when (1) the insurer waived by its conduct the enforcement of a particular policy provision, (2) the insured relied to its detriment on the insurer's conduct, and (3) it would be unjust to allow the insurer to enforce the policy provision under the given circumstances.

Lexington argues on appeal that it could not have waived this part of the policy, because doing so would impermissibly "change, re-write and enlarge the risks covered by the policy." Tex. Farmers Ins. Co. v. McGuire, 744 S.W.2d 601, 603 (Tex. 1988). The provision, though, is distinct from the notice provisions discussed earlier. Waiver of this provision would not substantively "create insurance coverage where none exists by the terms of the policy," as in McGuire. Id. at 602-03; see also Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 778-80 (Tex. 2008). It is a procedural requirement designed to give the insurer prompt notice of the details of claims and lawsuits filed. Though useful to the insurer, it does not change the kind or scope of claims and suits covered by the policy. Its violations would not affect coverage absent proof of prejudice.

We are more troubled, though, by the district court's conclusion that the jury was entitled to find that Lexington had actually waived this provision. This finding was based entirely on the three letters, referred to earlier, which Lexington sent the Medical Center after receiving loss runs. The district court found that because these letters "asked [the Medical Center] to forward copies of certain medical records and correspondence with counsel, but failed to request any legal documents related to the reported claim," the jury could have found that Lexington waived its right to immediate forwarding.

We do not see how Lexington's sending a letter requesting internal hospital documents – which the policy does not appear to require – can mean

that it waived its right to enforcement of an unrelated policy provision requiring immediate production of claim and suit papers. "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." Ulico, 262 S.W.3d at 778. For all Lexington knew, there were not yet any such papers. The Medical Center has argued, and we agreed, that these letters were usable evidence that Lexington accepted loss runs as notices of claim. But quite differently, the elliptical nature of the loss runs would give Lexington no idea what documents the hospital had in its possession. It had to rely on the Medical Center to fulfill its policy obligations.

If these letters from Lexington that have been found to reveal acceptance of loss runs as notice of claim also constituted waivers of receiving thorough documentation of the claim and any litigation, the insurer would be in a quandary. To avoid this result, perhaps the insurer could restate in all correspondence such other policy provisions as required further information, and state that such information was still needed. No Texas precedent shown to us suggests such a result. It was not reasonable for the jury to find that Lexington waived its rights under this provision. We conclude there was no waiver.

On remand, Lexington will still need to show that it was prejudiced by the Medical Center's failure to abide by this policy provision.

(5) Texas Insurance Code Claim

Last, we address the Medical Center's claims for misrepresentation under the Texas Insurance Code. The jury found that Lexington committed an actionable misrepresentation. The district court overturned the verdict and granted a JMOL to Lexington on these claims.

The alleged misrepresentation was a statement, made by Lexington in its January 2004 letter denying the Cornelius claim, that it will deny any claim unless the insured strictly complies with the insurance policy's notice

requirements. This statement was allegedly false because Lexington's conduct with respect to other claims supported by loss runs indicates that it does not in fact require such strict compliance. Lexington's stated reason for denying the claim would therefore be a sham.

The district court found that there was nothing misleading in Lexington's letter. The letter referred to the Medical Center's failure to report the suit as soon as practicable, and to the failure to forward suit papers immediately. The Medical Center also cited the three letters acknowledging notice of claims on the basis of loss runs as evidence of Lexington's disparate treatment of claims. The district court found, though, that the letters simply acknowledged receipt of claims, while the reasons cited for denial of the Cornelius claim related to distinct policy provisions.

As explained above, the Medical Center, without legitimate dispute, failed to comply with the policy provisions cited in the January 2004 letter. The effect of that noncompliance remains an open issue, though, because of the question of prejudice. In addition, the June 2003 letters that responded to other claims did not create a waiver of the requirement to forward papers immediately. There also was not a waiver of the right to receive notice of the suit.

While the issue of prejudice remains to be determined, the Medical Center cites no Texas case in which an insurer has been held to have committed either intentional or negligent misrepresentation by citing valid reasons for rejecting a claim. Even if the Medical Center ultimately prevails because Lexington was not prejudiced, "mere breach of contract, without more, does not constitute a 'false, misleading, or deceptive act.'" Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 14 (Tex. 1996) (quoting Ashford Dev., Inc. v. USLife Real Estate Serv., 661 S.W.2d 933 (Tex. 1983)). The Medical Center did not show either that the

statement in the letter was false, or that the statement caused it any damage. The jury's verdict on this point was unsustainable.

## III. CONCLUSION

We have found no error as to some issues. As to others, there is a need for further proceedings. Whether to order further proceedings on all becomes the question. A United States District Court has the right to "grant a new trial on all or some of the issues . . . ." Fed. R. Civ. P. 59(a). This court has the same authority. Anderson v. Siemens Corp., 335 F.3d 466, 475 (5th Cir. 2003).

In using the authority, we should order a new trial on the entire case when the issues on which reversal is granted "cannot be submitted to the jury independently . . . without confusion and uncertainty, which would amount to a denial of a fair trial" to the party whose unfavorable results from the first trial were not reversed. Id. (quoting Gasoline Prod. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931)). In different words, a new trial just on part of a case is permitted when "it appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Colonial Leasing of New England, Inc. v. Logistics Control Int'l, 770 F.2d 479, 481 (5th Cir. 1985) (quoting Gasoline Prod., 283 U.S. at 500). With those principles in mind, we review where we have found error and where we have not.

Using the enumeration of issues that we followed in our earlier analysis, we have sustained the following: (1) that the loss runs constituted sufficient notice of claim under the policy; (2) that the policy required separate notices for the claim and for the suit; and (5) that Lexington was entitled to a JMOL on the Texas Insurance Code claims. We have found error in the district court's conclusions that (3) Lexington did not have to show it was prejudiced by failure to file separate notice of the suit; and (4) that Lexington waived its right to require immediate forwarding of papers related to the suit and claim. We

reverse only because Lexington must be shown to have been prejudiced by the late notice of the suit and by not being sent the legal documents that were being submitted to the Medical Center about the patient's claim.

Under the Gasoline Products analysis, we conclude that the issues on which we have found reversible error are distinct from those on which we have not. A new trial on the prejudice issues alone would not be unfair to any party.

We VACATE the judgment and REMAND for further proceedings on the third and fourth issues. The district court's damages and cost awards will need to be reconsidered once the questions about prejudice are answered.

VACATED AND REMANDED.