# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2012

No. 11-50595

Lyle W. Cayce
Clerk

BERKLEY REGIONAL INSURANCE COMPANY, as Subrogee of Venus Rouhani and as Assignee/Subrogee of the Tower of Town Lake Condominium Association, Inc.,

Plaintiff - Appellee

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, HAYNES, and HIGGINSON, Circuit Judges.

HAYNES, Circuit Judge:

Philadelphia Indemnity Insurance Company ("Philadelphia") appeals the grant of summary judgment to Berkley Regional Insurance Company ("Berkley"). We REVERSE and REMAND.

## I. Facts

As the district court aptly characterized it, this case is "factually straightforward, [but] contractually complex." *Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, No. 1:10-CV-362, Order at 2 (W.D. Tex. Apr. 27, 2011). Accordingly, we describe only those facts necessary to gain an understanding of the insurance coverage question presented here.

No. 11-50595

The underlying liability case involved a 2004 slip-and-fall by dentist Venus Rouhani ("Rouhani") on the premises of the Towers of Town Lake Condominiums ("Towers"). Towers had general liability coverage in the form of a primary policy issued by Nautilus Insurance Company ("Nautilus") with a policy limit of $1 million per occurrence, and excess/umbrella coverage through Philadelphia with a policy limit of $20 million for liability exceeding the primary policy's coverage. Rouhani sued Towers which submitted the case to Nautilus to provide a defense.[1] For purposes of the summary judgment at issue here, the parties agree that Philadelphia did not receive notice of the Rouhani lawsuit at that time.[2]

Rouhani's injuries were substantial—she was unable to continue practicing as a dentist. Expert reports put Rouhani's damages at $800,000 (the defense's number) or $1.25 million (the plaintiff's number). The parties, however, contested liability, yielding a situation where Rouhani made various settlement demands. Rouhani's initial settlement demand was $800,000. At a mediation in the underlying litigation, the parties reached an impasse with Rouhani's "bottom" offer at $215,000 and Towers/Nautilus's "top" offer at $150,000.

With negotiation attempts having failed, the case went to trial, and the jury awarded Rouhani $1,654,663.50; ultimately, the judgment incorporated the jury verdict plus post-judgment interest and costs. The day of the verdict, Towers demanded that Philadelphia pay the amount in excess of the primary coverage amount. Philadelphia contends this was the first time it had notice of

---

[1] It is undisputed that Nautilus provided a defense to Towers in the Rouhani lawsuit.

[2] The district court determined, and the parties do not dispute, that there is a fact issue as to whether Philadelphia received "constructive notice" through an insurance agent. *See Berkley Reg'l*, Order at 18 & n.11. We express no opinion on this matter. We will assume for purposes of this appeal that Philadelphia received no notice before the jury verdict was rendered, without prejudice to the factual development of this issue on remand.

this suit (or claim). In addition to contesting coverage for late notice, Philadelphia also interposed certain policy defenses.

Nautilus filed an appeal on behalf of Towers that was ultimately unsuccessful. *Towers of Town Lake Condo. Ass'n v. Rouhani*, 296 S.W.3d 290 (Tex. App.—Austin 2009, pet. denied). In order to avoid execution of the judgment during the appeal, Nautilus obtained supersedeas bonds from Berkley, its sister company. When the appeals were exhausted, Nautilus paid what it concluded it owed under the primary policy, and Berkley paid the remaining $709,738.89 under its supersedeas bond after Philadelphia, which did not participate in the appeal, denied responsibility for that amount. Through a series of complex assignments that are unchallenged here,[3] Berkley now owns whatever rights Rouhani, Towers, and Nautilus had against Philadelphia. Berkley, in turn, has allowed Nautilus to bring this lawsuit against Philadelphia in Berkley's name as assignee and subrogee.

In the district court, both sides moved for summary judgment. The only issue pertinent to this appeal is whether the failure to give Philadelphia notice prior to the jury verdict forfeits coverage it may otherwise owe.[4] In support of its position that coverage had been forfeited, Philadelphia argued that its policy requires prompt notice of any occurrence involving, *inter alia*, "permanent disabilities," "any coverage issue which may trigger a reservation of rights or

---

[3] Though it seeks no relief as a result, Philadelphia notes that because of these various assignments, it has lost any ability to make a *Stowers* claim through equitable subrogation. *See Am. Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 481-83 (Tex. 1992) (allowing equitable subrogation by an excess carrier to the insured's *Stowers* claim against the primary carrier); *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved). It does not argue that it has a *Stowers* right through any other vehicle. Thus, we express no opinion on that issue or on the issue of whether an insured can defeat an excess carrier's *Stowers* claim through the kind of transactions that took place here.

[4] Philadelphia's other defenses are not before us on appeal, and we express no opinion as to their validity.

coverage declination," and any "incurred exposure of $500,000 or above." In addition, Philadelphia pointed out that its policy further provides that "[w]hen [Philadelphia] believe[s] that a claim may exceed the 'underlying insurance', [it] may join with the insured and the 'underlying insurer' [Nautilus] in the investigation, settlement and defense of all claims and 'suits' in connection with such 'occurrence' . . . . In such event, the insured must cooperate with [Philadelphia]." According to Philadelphia, the circumstances surrounding the underlying litigation triggered the notice requirement, and the lack of notice prior to the adverse jury verdict caused prejudice, thereby precluding coverage.

The district court, however, rejected Philadelphia's position, concluding instead that, as a matter of law, Philadelphia was not prejudiced by the lack of notice prior to the adverse jury verdict. It ultimately granted summary judgment in favor of Berkley for the amount of the judgment in *Rouhani* in excess of the amount paid under the Nautilus policy. This timely appeal followed.

## II.  Standard of Review

We review a district court's award of summary judgment *de novo*, applying the same standard as the district court. *See, e.g., Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.*, 592 F.3d 687, 690 (5th Cir. 2010). Summary judgment is appropriate "if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011); *see* FED. R. CIV. P. 56(a).

## III.  Discussion

The parties agree that Texas law applies to the question presented here: Does the failure to give notice to an excess carrier until after an adverse jury

verdict constitute evidence of prejudice that forfeits coverage?[5]

The Texas Supreme Court first delved into the area of notice provisions in *Members Mutual Insurance Co. v. Cutaia*, 476 S.W.2d 278 (Tex. 1972). There, the court addressed "[o]nly the condition regarding the forwarding of suit papers," and concluded that in light of the plain wording of the contract,[6] as well as the prior holdings of the court, the notice-of-suit requirement contained in the automobile liability policy at issue was a condition precedent such that noncompliance yielded forfeiture of coverage. *Id.* at 278-81. In reaching this conclusion, however, the court acknowledged "the apparent injustice which result[ed] in this particular case," stating further that it "share[d] some of the impatience which naturally arises when a reasonable provision or condition in an insurance policy is used by the insurance company to defeat what appears to be a valid claim." *Id.* at 281.

Nevertheless, the *Cutaia* court asserted that it would not rewrite insurance contracts in order to remedy this apparent injustice, noting rather that it was up to the State Board of Insurance or the legislature to "insert a provision that violations of conditions precedent will be excused if no harm

---

[5] Some sub-issues arise under this question, but it nonetheless appropriately frames our analysis of Texas law.

[6] According to the *Cutaia* court,

[t]he policy of insurance expressly provided certain conditions. Among the conditions were those which required [the insured] to give notice of any accident and to forward any suit papers immediately to the company. . . . The policy further provided that "no action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy. . . ." There is no provision in the policy that failure to comply with the conditions precedent would be excused if no harm or prejudice were suffered by the insurer; and such a provision would have to be inserted into the policy by implication.

*Id.* at 278.

results from their violation."[7]  *Id.*  The next year, by issuing Board Order 23080, the State Board of Insurance did just that:

> As respects *bodily injury* liability coverage and *property damage* liability coverage, unless the company is prejudiced by the *insured's* failure to comply with the requirement, any provision of this policy requiring the *insured* to give notice of action, *occurrence* or loss, or requiring the *insured* to forward demands, notices, summons or other legal process, shall not bar liability under this policy.

State Bd. of Ins., *Revision of Texas Standard Provision for General Liability Policies—Amendatory Endorsement—Notice,* Order No. 23080 (Mar. 13, 1973), *available at* http://www.tdi.state.tx.us/commercial/pcck23080.html. Thus, Board Order 23080 effectively superseded *Cutaia*'s discussion of prejudice as to certain policies.[8]

Thereafter, cases involving an insured's failure to comply with notice and related requirements consistently recognized that although the policy provisions imposing these requirements were valid, no forfeiture of coverage from breaching such obligations would result absent prejudice to the insurer.  *See, e.g., Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 174 (Tex. 1995) ("The insured's failure to notify the insurer of a suit against her does not relieve the insurer from liability for the underlying judgment unless the lack of notice prejudices the insurer."). These cases based their reasoning on the contractual nature of insurance policies and the general rules of contract construction. *See Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.,* 683 F.3d 79, 89 (5th Cir. 2012)

---

[7] Importantly, as recognized in *PAJ, Inc. v. Hanover Insurance Co.*, 243 S.W.3d 630 (Tex. 2008), "[t]he 'as a condition precedent' language was deleted from the standard [Commercial General Liability] policy following [the court's] decision in *Cutaia* . . . ." *Id.* at 636.  Like the policy at issue in *PAJ*, the Philadelphia policy does not contain this language.

[8] Notably, however, *Cutaia* remained valid in cases not covered by Board Order 23080. *See, e.g., Weaver v. Hartford Accident & Indem. Co.*, 570 S.W.2d 367, 369-70 (Tex. 1978) (citing the holding in *Cutaia* in another case involving the duty to forward process where an additional insured failed to comply with the policy's notice-of-suit provision).

("Insurance policies are interpreted using the same rules governing other contracts.").

For example, in *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691 (Tex. 1994), the Texas Supreme Court held that where an insurer is not prejudiced by the insured's breach, the insurer is "not excused from its obligation to perform under the contract." *Id.* at 694. In reaching its conclusion, the court recognized that "[i]nsurance policies are contracts, and as such are subject to rules applicable to contracts generally." *Id.* at 692. The court further noted that "[a] fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Id.* The court explained that "materiality of a breach" depends on, *inter alia*, "the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Id.* at 693. Accordingly, "[t]he less the non-breaching party is deprived of the expected benefit, the less material the breach." *Id.* The *Hernandez* court thereby held that the insureds' failure in that case to obtain the insurer's consent before settling was not a material breach:

> Gulf . . . stipulated that it "has not incurred any financial losses . . . with regard to its subrogation rights by the failure of the [Hernandezes] to obtain [its] consent before settling with McCullough and releasing him from all liability." Gulf, therefore, remains in the same position it would have occupied had the Hernandezes complied with the settlement-without-consent clause. Since Gulf has not been prejudiced by the Hernandezes' breach, the breach is not material, and Gulf therefore is not excused from its obligation to perform under the contract.

*Id.* at 693-94 (aleterations in original) (footnote omitted); *see also Hanson Prod. Co. v. Ams. Ins. Co.*, 108 F.3d 627, 630 (5th Cir. 1997) (noting that the Texas Supreme Court in *Hernandez* held that "where the insurer is not prejudiced by the breach, the breach is not material, the insurer has not been deprived of the

No. 11-50595

benefit of the bargain, and it should not be relieved of its obligation to provide coverage").

Whereas *Hernandez* involved the breach of a consent-to-settle provision, most recently in *PAJ* and *National Union Fire Insurance Co. v. Crocker*, 246 S.W.3d 603 (Tex. 2008),[9] the Texas Supreme Court analyzed breach of notice provisions in like manner. Specifically, in *PAJ*, the court addressed "whether an insured's failure to timely notify its insurer of a claim defeats coverage under the policy if the insurer was not prejudiced by the delay." 243 S.W.3d at 631. After discussing the development of relevant caselaw, such as *Cutaia* and *Hernandez*, and considering the impact of Board Order 23080, *see id.* at 632-34, the *PAJ* court relied on contract principles in holding that "an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay," *id.* at 636-37.[10] The court further indicated, "[w]e hold, as we did in *Hernandez*[,] . . . that an immaterial breach does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation." *Id.* at 631; *cf. Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 296 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("[T]he standard for determining if the insurer has been prejudiced by late notice is whether the insured has suffered an adverse change in position due to the delay.").

---

[9] As in the instant case, *PAJ* and *Crocker* involved "occurrence" policies. An "occurrence" policy is one in which the covered event must "occur" during the policy period regardless of when a claim is made or suit is filed. This is in contrast to a "claims made" policy in which the claim is covered if it is first made during the policy period. The Texas Supreme Court recently addressed "claims made" notice issues in *Prodigy Communications Corp. v. Agricultural Excess & Surplus Insurance Co.*, 288 S.W.3d 374 (Tex. 2009).

[10] Unlike the parties here, the parties in *PAJ* stipulated that the insured had failed to timely notify the insurer by not notifying the insurer until four to six months after litigation commenced, but that the insurer was not prejudiced by the untimely notice. 243 S.W.3d at 631.

No. 11-50595

One month after *PAJ*, the Texas Supreme Court decided *Crocker*. In *Crocker*, the plaintiff, a resident of a nursing home owned by Emeritus Corporation ("Emeritus"), filed a lawsuit against Emeritus and Richard Morris ("Morris"), a nursing home employee, "seeking compensation for injuries suffered when she was hit by a door swung open by Morris." 246 S.W.3d at 604. Emeritus had a commercial general liability policy issued by National Union Fire Insurance Company of Pittsburgh ("National Union") that covered the plaintiff's claims. *Id.* Unbeknownst to Morris, however, since "Morris was acting within the course and scope of his employment when the accident occurred, he qualified as an additional insured under the policy." *Id.* Nevertheless, although National Union defended the lawsuit against Emeritus, it took no action on behalf of Morris who did not appear at trial or otherwise defend the case. *Id.* at 604-05.

At trial, the court severed the plaintiff's claims against Morris from her claims against Emeritus. *Id.* at 605. Emeritus received a jury verdict in its favor, but a default judgment was entered against Morris for $1 million.[11] *Id.* With the default judgment in hand, the plaintiff sued National Union as Morris's judgment creditor, contending that "even though Morris did not comply with the notice-of-suit provision, National Union had actual knowledge of [the underlying] suit, and hence was not prejudiced by Morris's failure to forward the suit papers." *Id.*

The Texas Supreme Court first determined that National Union had no duty to notify Morris of his potential coverage as an additional insured.[12] *Id.* at

---

[11] The *Crocker* court noted that the default judgment against Morris was "directly contrary" to the jury verdict in favor of Emeritus because the jury rejected the plaintiff's claim against Emeritus based on its refusal to find the actions of Morris, Emeritus' agent, negligent. 246 S.W.3d at 607 n.22.

[12] The court made this determination in response to the following certified question from our court: "Where an additional insured does not and cannot be presumed to know of coverage under an insurer's liability policy, does an insurer that has knowledge that a suit implicating policy coverage has been filed against its additional insured have a duty to inform

No. 11-50595

606-08. According to the court, "an insurer that has not been notified that a defense is expected bears no extra-contractual duty to provide notice that a defense is available to an additional insured who has not requested one." *Id.* at 608. It then turned to the prejudice issue, and addressed a question certified from this court:

> Does proof of an insurer's actual knowledge of service of process in a suit against its additional insured, when such knowledge is obtained in sufficient time to provide a defense for the insured, establish as a matter of law the absence of prejudice to the insurer from the additional insured's failure to comply with the notice-of-suit provisions of the policy?

*Id.* at 609 (citation omitted). Noting that "National Union had no duty to notify Morris of coverage and no duty to defend Morris until Morris notified National Union that he had been served with process and expected National Union to answer on his behalf," and that "[a]bsent a threshold duty to defend, there can be no liability to Morris, or to [the plaintiff] derivatively," the court answered "no" to the question we raised.[13] *Id.*

Unlike the instant case, *Crocker* involved a primary insurer. *Crocker* thereby focused on the need for notice of suit to trigger the duty to defend. *Id.* Importantly, however, the *Crocker* court did not hold that notice is necessary only in cases where a duty to defend is owed, and other cases have suggested the contrary. Notice of a claim or occurrence "enable[s] an insurer to investigate the circumstances of an accident . . . so that it may adequately prepare to adjust or defend any claims that may be then or thereafter asserted against persons

---

the additional insured of the available coverage?" *Id.* at 606 (quoting *Crocker v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 466 F.3d 347, 359 (5th Cir. 2006) (per curiam)).

[13] Although the *Crocker* court acknowledged that the question before it was "not whether National Union suffered exposure to a financial risk, but whether it should be estopped to deny coverage because it was aware that Morris had been sued and served and had ample time to defend him," it nonetheless observed that "National Union was obviously prejudiced in the sense that it was exposed to a $1 million judgment." *Id.*

10

No. 11-50595

covered by its policy," *Employers Casualty Co. v. Glens Falls Insurance Co.*, 484 S.W.2d 570, 575 (Tex. 1972).

Indeed, "[w]hen an insurer must prove it was prejudiced by the insured's failure to comply with the notice provisions, the recognized purposes of the notice requirements form the boundaries of the insurer's argument that it was prejudiced; a showing of prejudice generally requires a showing that one of the recognized purposes has been impaired." *Blanton v. Vesta Lloyds Ins. Co.,* 185 S.W.3d 607, 612 (Tex. App.—Dallas 2006, no pet.) (citation and internal quotation marks omitted). Against that backdrop, the rights afforded the insurer by the notice requirement—including, but not limited to, the rights to "join in" the investigation, to settle a case or claim, and to interpose and control the defense—are considered valuable rights that if deprived, may prejudice the insurer. *See, e.g., Trumble Steel Erectors, Inc. v. Moss,* 304 F. App'x 236, 239, 244 (5th Cir. 2008) (per curiam) (unpublished) (recognizing that under Texas law "'[p]rejudice' is the loss of a valuable right or benefit"; noting that prejudice may result when the failure to timely notify an insurer deprives the insurer of its right "to investigate when and in the manner that an insurer would have liked"); *Clarendon Nat'l Ins. Co. v. FFE Transp. Servs.,* 176 F. App'x 559, 561-62 (5th Cir. 2006) (unpublished)[14] (concluding that the insured's failure to give notice caused prejudice to the insurer by denying the insurer a "valuable right" within the meaning of Texas law, specifically, the right to settle the case); *Blanton*, 185 S.W.3d at 615 ("[P]rejudice from failure to notify timely arises from inability to investigate the circumstances of an occurrence to prepare adequately to adjust or defend any claims, not merely to prepare for trial."); *cf. Hernandez*, 875 S.W.2d at 693 (concluding that when an insured's breach does not deprive the insurer of a valuable right afforded by the policy, the breach does not prejudice the insurer).

---

[14] Although *Trumble* and *Clarendon* are unpublished and therefore not binding, they address similar factual situations and thus provide helpful and persuasive authority here.

No. 11-50595

From the foregoing, we distill various principles applicable to the instant case. Whereas certain contractual obligations in a general liability policy, such as the duty to defend[15] and the duty to indemnify, protect the insured, other obligations protect the insurer. For example, generally, under a liability policy, the insured must notify the insurer of an occurrence or claim for which damages within coverage of the policy may be sought and/or a resulting suit,[16] and it must give notice to, or obtain consent from, the insurer prior to settling any such case or claim. In this way, the insurer protects, at minimum, its right to participate in the underlying liability litigation, and it also preserves the opportunity to minimize its losses.[17]     Notice requirements thus afford valuable rights. Nevertheless, it is likewise clear that in order for an insured's breach to defeat coverage, the breach must prejudice the insurer in some tangible way. *See, e.g., PAJ*, 243 S.W.3d at 636-37. Although we distill these principles from cases involving primary carriers, we discern no basis for a different rule for excess carriers. While their responsibilities are different and, thus, they may not suffer prejudice in all of the circumstances where a primary carrier would, they nonetheless have a contract with the insured and are entitled to rely upon the same contract principles discussed above. *See E. Tex. Med. Ctr.*, 575 F.3d at 529-30 (applying same rules of contract construction and notice-prejudice rule to an excess carrier as apply to a primary carrier); *see also Prince George's Cnty. v. Local Gov't Ins. Trust*, 879 A.2d 81 (Md. 2005) (applying Maryland law and

---

[15] The right to defend can also be a valuable right to the insurer.

[16] *See E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, 575 F.3d 520, 529-30 (5th Cir. 2009) (discussing the difference between notice of a claim and notice of a suit). Philadelphia contends it received no notice of anything involving Rouhani until the verdict-day notice.

[17] Notably, no binding case has held that notice provisions are unenforceable or irrelevant. Indeed, no one disputes the salutary purpose of requiring the insured to provide notice. Nor would anyone dispute that prompt notice to all potentially affected insurers is the best approach where coverage is sought.

12

concluding that the requirement to show prejudice applies to excess carriers as well as primary carriers and finding prejudice as a matter of law where excess carrier did not receive notice until ten days after a large jury verdict).[18]

Defining the contours of prejudice from the breach of a notice requirement, however, is not always easy. It is true that when an insurer first receives notice of a suit after a default judgment has been entered, prejudice exists as a matter of law. *See, e.g., Liberty Mut. Ins. Co. v. Cruz*, 883 S.W.2d 164, 166 (Tex. 1993) (per curiam) ("[A]n insurer that is not notified of suit against its insured until a default judgment has become final . . . is prejudiced as a matter of law."); *Kimble v. Aetna Cas. & Sur. Co.*, 767 S.W.2d 846, 849-51 (Tex. App.—Amarillo 1989, writ denied) (finding prejudice as a matter of law in a notice-after-default case even though the insurer learned of the default judgment entered against its insured before it became final).

Moreover, once the case is "over," notice is clearly too late. *See Md. Cas. Co. v. Am. Home Assurance Co.*, 277 S.W.3d 107, 117 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd) (concluding that insurer had established, as a matter of law, that it was prejudiced because "notice—provided only after the claims had been settled—was so late that it wholly deprived [the insurer] of its ability to defend the lawsuit"). Indeed, the Texas Supreme Court indicated as much in distinguishing *Crocker* from *PAJ*: "[I]n *PAJ*, the named insured made a request for coverage under the policy, albeit several months after 'as soon as [was] practicable.' In the pending case, however, the additional insured's notice was not merely late; it was wholly lacking. PAJ's notice was tardy; Morris's was nonexistent." *Crocker*, 246 S.W.3d at 609(alteration in original); *see also Md.*

---

[18] Like Texas, Maryland is a "notice-prejudice rule" state. *See Prince George's Cnty., 879 A.2d at 94 n.9 (cataloging states with the same rule as Maryland, including Texas); see also PAJ*, 243 S.W.3d at 634 (citing *Prince George's County* for proposition that Texas is a "notice-prejudice rule" state). *Prince George's County* involved an insurance pool trust functioning as an excess carrier. 879 A.2d at 84.

*Cas.*, 277 S.W.3d at 118-19 ("[A]s the supreme court has noted, determining whether prejudice arises from a tardy notice is a different inquiry than determining whether prejudice arises from a complete lack of notice. As in *Crocker*, the notice here was wholly lacking. Under the circumstances presented in the instant case, wholly lacking notice, as opposed to merely late notice, supports a finding of prejudice as a matter of law." (citations omitted)).

On the other hand, learning about a case before verdict—even when it is already well "down the road"—does not necessarily mean that the insurer was prejudiced as a matter of law. *See Coastal Ref.*, 218 S.W.3d at 290-92 (reversing summary judgment for insurer on a late notice case; evidence showed that although the insurer was notified of the suit before trial and invited to participate in settlement negotiations, it failed to join; insurer could not show it was prevented "from defending the suit or controlling settlement negotiations after notice was received"; insurer could not show that delayed notification prevented its investigation).

Berkley argues that this case is more like the "better late than never" cases and not like *Crocker* because no default was entered; rather, the case was litigated by competent counsel to a jury verdict. We disagree with Berkley. Construing, as we must, the facts in the light most favorable to the non-moving party, Philadelphia was not just notified "late," it was notified after all material aspects of the trial process had concluded and an adverse jury verdict was entered. It lost the ability to do any investigation or conduct its own analysis of the case, as well as the ability to "join in" Nautilus's evaluation of the case.

Most importantly, however, Philadelphia lost a seat at the mediation table. Mediation, by nature, is a dynamic process, and for that very reason, parties are expected (and usually ordered) to appear ready to negotiate and with "full" settlement authority. *See Decker v. Lindsay*, 824 S.W.2d 247, 250-52 (Tex. App.—Houston [1st Dist.] 1992, no writ) (holding that a court is allowed to order

parties to mediate but cannot order them to "negotiate in good faith"); *cf. In re United States*, 149 F.3d 332, 333 (5th Cir. 1998) (per curiam) (holding that the trial court did not abuse its discretion in "mandating that the United States be represented at mediation by a person with full settlement authority").

Thus, we cannot fully know what effect, if any, Philadelphia's participation would have had on this process—*e.g.,* convincing Nautilus to take Rouhani's offer of $215,000, convincing Rouhani to come down further or accept Nautilus' offer of $150,000 , or even "dropping down" to pay the $65,000 difference between the parties' offers (with or without a side agreement between itself and Nautilus to litigate who must ultimately pay that amount).  All of these rights were lost, leaving Philadelphia holding the bag for more than $700,000 in excess liability if Berkley prevails.  *Cf. Coastal Ref.*, 218 S.W.3d at 291 (distinguishing *Clarendon* because there the insurer "proved actual prejudice in that it lost the opportunity to settle the case for an amount within the insured's self-insured retention").  Certainly, once a jury verdict that dwarfs the settlement demand is entered, the settlement and litigation posture changes. *See Prince George's Cnty.*, 879 A.2d at 100 (concluding that excess carrier was prejudiced by being "precluded . . . from exercising any of its rights").  Additionally, Berkley's argument that Philadelphia could have participated in the appeal rings hollow when one reviews the standards of review applicable to the appellate issues presented in the underlying case.[19]  The cows had long since left the barn when Philadelphia was invited to close the barn door.[20]

---

[19] In *Rouhani*, Towers challenged legal sufficiency and the absence of a certain requested jury instruction.  296 S.W.3d at 293.  As asserted by the *Rouhani* court, "[i]n a legal sufficiency challenge, [the court] review[s] the evidence in the light most favorable to the judgment . . . ." *Id.* at 295.  In addition, the court "review[s] the trial court's decision to submit or refuse a particular instruction under an abuse-of-discretion standard," and gives the trial court "more discretion when submitting instructions than when submitting questions." *Id.*

[20] Thus, we need not reach the question discussed in *St. Paul Guardian Insurance Co. v. Centrum G.S. Ltd.*, 383 F. Supp. 2d 891 (N.D. Tex. 2003), of whether the failure to give

No. 11-50595

Philadelphia's representative William Gross provided an affidavit in which he stated: "Philadelphia was deprived of the opportunity to investigate the accident, to contribute to the development of a defense strategy, to participate in the lawsuit, to evaluate the settlement demands, to accept or reject any of the settlement demands, or to otherwise represent its interests during the pendency of the underlying litigation . . . . Philadelphia would have exercised these rights had it been given the opportunity by being put on notice." Under the circumstances, in light of (1) this affidavit, (2) the fact that significant settlement demands and a mediation occurred without Philadelphia's knowledge, and (3) the rendering of a jury verdict before notice was given, we conclude that Philadelphia has presented sufficient facts in support of its position that it suffered prejudice to avoid summary judgment.[21] We thus REVERSE the grant of summary judgment to Berkley and REMAND for further proceedings consistent with this opinion.

Philadelphia also argues that it is entitled to summary judgment in its favor. We are unable to reach this issue because fact issues exist.[22] Accordingly, we leave it to the district court to address Philadelphia's argument in the first instance in light of the analysis here provided.

REVERSED AND REMANDED.

---

notice before a low-dollar settlement opportunity is lost can, without more, constitute prejudice. *See id.* at 902-03.

[21] Additionally, Berkley argues that Philadelphia is not entitled to assert the notice defense because it also asserted other coverage defenses when it finally received notice of the claim after the verdict. Finding no support for this proposition in Texas law, we reject this argument.

[22] Furthermore, the only motion for summary judgment Philadelphia filed that we located in the record did not move on the "late notice" ground but rather on an "anti-assignment" argument not raised on appeal.